UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER J. NICHOLS,

    Plaintiff,

v.

STAT RADIOLOGY MEDICAL CORPORATION,

    Defendant.
_____/

Case No. 19-cv-11398
Hon. Matthew F. Leitman

## ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 32) AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 31)

In this action, Plaintiff Jennifer J. Nichols, as the assignee of Trinity-Health Michigan ("Trinity"), brings a claim for breach of contract and indemnification against Defendant STAT Radiology Medical Corporation ("STAT"). (*See* Compl., ECF No. 1-2.) Both parties have now moved for summary judgment. (*See* Mots., ECF No. 31, 32.) For the reasons explained below, the Court **GRANTS** STAT's motion for summary judgment and **DENIES** Nichols' motion.

**I**

**A**

Trinity is a hospital in Port Huron, Michigan. It contracted with non-party X-Ray Associates of Port Huron, P.C. ("X-Ray") to provide radiology services at its hospital. (*See* ECF No. 31-6, PageID.382.) X-Ray, in turn, subcontracted with

1

STAT "to provide distant-site interpretations of radiology services performed at [Trinity]." (*See id.*)

Trinity wanted to be certain that the STAT radiologists contracted by X-Ray to interpret Trinity radiology images were properly licensed and credentialed. To that end, on June 28, 2011, Trinity entered into an agreement with STAT titled "Agreement for Credentialing Verification Services" (the "Credentialing Agreement"). (*See id.*) The initial clauses of the Credentialing Agreement (1) identified the subcontract between X-Ray and STAT that obligated STAT to provide radiology services to Trinity patients and (2) set forth Trinity's intent in entering into the Credentialing Agreement with STAT:

> Whereas, [STAT] is an organization accredited by the Joint Commission and is in the business of providing teleradiology services; and
>
> Whereas, [Trinity] has an existing agreement with X-Ray Associates of Port Huron, P.C. [] for the provision of radiology services […]; and
>
> Whereas [X-Ray] has an existing agreement with [STAT] [] whereby [X-Ray] subcontracts with [STAT] to provide radiology services performed at [Trinity] []; and
>
> Whereas, in accordance with the standards promulgated by the Joint Commission and the conditions of participation promulgated by the Centers for Medicare & Medicaid Services [], as amended, [Trinity] wishes to have its medical staff rely upon the credentialing and privileging decisions made by [STAT] when recommending privileges for the individual [STAT]

2

radiologists who provide [radiology services under the agreement between X-Ray and STAT].

(*Id.*, PageID.382.)

In the next section of the Credentialing Agreement, STAT "represent[ed] and warrant[ed]" that "(i) [its] medical staff credentialing and privileging process and standards at least met [Trinity's s]tandard; (ii) each [STAT] radiologist providing [radiology services under the agreement between X-Ray and STAT] is privileged at [STAT]; and (iii) each [STAT] radiologist providing [radiology services under the agreement between X-Ray and STAT] holds a current license issued or recognized by the State of Michigan." (*Id.* at ¶2, PageID.382.) The Credentialing Agreement then imposed certain duties on STAT. For example, the Credentialing Agreement required STAT to:

- "[S]end to [Trinity] any and all credentialing and privileging paperwork (*e.g.*, documentation of primary source verification)" for "each radiologist wishing to perform [radiology services under the agreement between X-Ray and STAT] for [Trinity]." (*Id.*);
- "[T]imely provide any additional credentialing or privileging information or copies of any documentation in their credentialing or privileging files upon request from [Trinity]." (*Id.*)
- "[N]otify [Trinity] immediately of any material changes in or updates to the credentialing or privileging files of any radiologist providing

[radiology services under the agreement between X-Ray and STAT] for [Trinity] that could affect the privileging decisions of [Trinity]." (*Id.*, PageID.382-383.);

- "[P]rovide a complete copy of its Credentialing Policies and Peer Evaluation Policies to [Trinity]." (*Id.* at ¶3, PageID.383.);

- "[P]rovide [Trinity] with a listing of all [STAT] radiologists who may provide [radiology services under the agreement between X-Ray and STAT] to [Trinity], including the scope of privileges that [STAT] has granted to each radiologist []." (*Id.* at ¶4, PageID.383); and

- "Update [its list of radiologists] throughout the term of [the Credentialing Agreement] as new radiologists are employed by [STAT] to perform [radiology services under the agreement between X-Ray and STAT] for [Trinity]." (*Id.*)

Finally, the Credentialing Agreement included a mutual indemnification provision (the "Credentialing Agreement Indemnification Provision"). It provided as follows:

> Each party hereby indemnifies and holds the other party harmless from and against any and all liability, losses, claims, or causes of action, and expenses connected therewith (including reasonable attorney's fees), caused or asserted to have been caused directly or indirectly by its employees or agents, **by or as a result of the performance of their duties hereunder**. Nothing in this section shall relieve either party from liability proximately

4

caused by its employees in the normal course of their duties.

(*Id.* at ¶12, PageID.385; emphasis added.)

**B**

In January 2014, Nichols' husband died from a dissected aortic aneurism after being treated at Trinity. (*See* ECF No. 32-5, PageID.452.) In February 2016, Nichols, acting the personal representative of her husband's estate, filed a medical malpractice action against Trinity and several doctors involved in his care (the "Medical Malpractice Action"). (*See* Medical Malpractice Compl., ECF No. 32-5.) Nichols neither named STAT as a defendant in the Medical Malpractice Action nor specifically alleged in that action that STAT or any of its doctors were negligent. However, Nichols did allege that the misreading of an x-ray contributed to her husband's death, and she said that, at the time she filed the Medical Malpractice Action, she was not aware who was responsible for misreading the x-ray. (*See id.* at ¶¶ 20-25, PageID.448-449.) Nichols insisted that Trinity "was responsible for whoever interpreted [the] x-ray." (*Id.* at ¶24, PageID.449.)

Trinity believed that the doctor who initially misread the x-ray was a radiologist who worked for STAT. (*See* ECF No. 32-6, PageID.482.) Based upon that belief, Trinity filed a motion in the Medical Malpractice Action for leave to file a third-party complaint against STAT for contribution and for indemnification. (*See* Proposed Third-Party Compl., ECF No. 32-6.) In Trinity's proposed pleading, it

5

claimed that it was entitled to indemnification from STAT under the Credentialing Agreement Indemnification Provision because (1) performing radiology services was one of STAT's "duties" under the Credentialing Agreement and (2) the losses for which Nichols sought to recover (in her complaint against Trinity) arose out of STAT's negligent performance of those services. (*Id.,* PageID.491.) The state court denied Trinity's motion for leave to file its proposed third-party complaint against STAT. Therefore, the Medical Malpractice Action never included any claims against STAT.

On August 16, 2018, Nichols and Trinity settled the claims against Trinity in the Medical Malpractice Action. They memorialized their agreement in a written settlement agreement. (*See* Settlement Agmt., ECF No. 32-4.) Nichols agreed to "settle and compromise" her claims against Trinity "for the sum of One Million Five Hundred Thousand Dollars ($1,500,000.00)." (*Id.* at ¶2, PageID.441.) That amount was split into two components. First, Trinity agreed "to pay [Nichols] Five Hundred Thousand Dollars ($500,000.00)" directly. (*Id.*) Second, the "remaining One Million U.S. Dollars" was to be "collected" by Nichols pursuant to an assignment of rights from Trinity. (*Id.*) Under that assignment, Trinity assigned to Nichols its purported right to indemnification from STAT under the terms of the Credentialing Agreement Indemnification Provision. (*See id.* at ¶3a, PageID.441.) As described above, Trinity believed that it had a right to indemnification from STAT because it

believed that the losses claimed by Nichols arose from STAT's negligent performance of its duty to provide radiology services under the Credentialing Agreement.

Notably, the settlement agreement between Trinity and Nichols made clear that even if Nichols failed to obtain any funds from STAT under the assignment, Nichols could not compel Trinity to pay any amount over and above its $500,000 direct payment to her:

> After payment of the Five Hundred Thousand Dollars ($500,000) [...], the settlement recited herein is final and binding on [Nichols] and [Trinity], **regardless of whether or not [Nichols] is successful in recovering the remaining One Million U.S. Dollars ($1,000,000.00) against [STAT]**, its agents and/or insurers, pursuant to the assignment of rights and claims [...].

(*Id.* at ¶10, PageID.443; emphasis added). Nichols even "agree[d] and covenant[ed] not [to] sue [Trinity] after payment of the Five Hundred Thousand U.S. Dollars." (*Id.* at ¶4, PageID.442.)

### D

On May 22, 2019, Nichols filed this action against STAT in the St. Clair County Circuit Court. (*See* Compl., ECF No. 1-2.) Nichols sought a declaratory judgment that STAT was obligated to provide indemnification under the terms of the Credentialing Agreement Indemnification Provision, and she brought claims for

7

breach of contract and contribution under Michigan law.¹ (*See id.*) STAT thereafter removed Nichols' action to this Court based on the Court's diversity jurisdiction. (*See* Notice of Removal, ECF No. 1.)

The parties have now filed cross-motions for summary judgment. (*See* Mots, ECF No. 31, 32.) The Court held a video hearing on the motions on April 26, 2021. (*See* Notice of Hearing, ECF No. 39.)

## II

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at

---

¹ Nichols has since agreed to drop her claim for contribution and any claim she may have made for common-law indemnity. (*See* Resp. to STAT Mot. for Summ. J., ECF No. 36, PageID.615.) Thus, the only remaining claims before the Court arise out of the Credentialing Agreement Indemnification Provision.

251-52. "Credibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

### III

### A

The parties agree that Michigan law governs this diversity action. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Under Michigan law, "[a]n indemnity contract is to be construed in the same fashion as other contracts. The extent of the duty must be determined from the language of the contract, itself. All contracts, including indemnity contracts should be construed to ascertain and give effect to the intentions of the parties and should be interpreted to give a reasonable meaning to all of its provisions." *Zalm v. Kroger*, 764 N.W.2d 207, 210-11 (Mich. 2009; internal citations omitted). The Michigan Supreme Court has "generally observed that if the language of [an indemnity] contract is clear and unambiguous, it is to be construed according to its plain sense and meaning. Courts may not make a new contract for parties under the guise of a construction of the contract, if doing so will ignore the plain meaning of words chosen by the parties." *Id.* at 211 (internal citations omitted).

Finally, with respect to the assignment of contractual rights under Michigan law, "it is well established that an assignee stands in the shoes of an assignor, acquiring the same rights and being subject to the same defenses as the assignor."

9

*Wells Fargo Bank, N.A. v. SBC IV REO, LLC*, 896 N.W.2d 821, 840 (Mich. App. 2006).

**B**

As an initial matter, Nichols' theory that she is entitled to $1 million in indemnification from STAT cannot be squared with the terms of the Credentialing Agreement Indemnification Provision. As described above, in that provision, Trinity and STAT agreed to indemnify each other "from any against any and all liability, losses, claims, or causes of action, and expenses connected therewith (including reasonable attorney's fees)…." (ECF No. 31-6, PageID.385.) Here, Trinity's "losses" were strictly limited to $500,000 – the amount it paid Nichols out of its own pocket. Indeed, even though the settlement agreement listed $1.5 million as the full amount of the settlement, the agreement made absolutely clear that Trinity could not be compelled to pay Nichols a penny more than $500,000. (*See* Settlement Agmt., ECF No. 32-4, PageID.443.) Thus, under the plain language of the Credentialing Agreement Indemnification Provision, the most that Trinity could recover from STAT is the $500,000 it paid Nichols (plus the expenses Trinity incurred as a result of STAT's alleged breach of its duties under the Credentialing Agreement). Because Trinity could not recover more than $500,000 (plus expenses) in indemnification from STAT, Nichols (as Trinity's assignee) likewise could not

recover more than that amount from STAT. *See Wells Fargo Bank*, 869 N.W.2d at 840.

C

Nichols has a more fundamental problem that dooms her entire claim for indemnification under the Credentialing Agreement Indemnification Provision. That provision only requires STAT to indemnify Trinity for losses "caused or asserted to have been caused … *as a result of the performance of [STAT's] duties hereunder*." (*See* ECF No. 31-6, PageID.385; emphasis added.) But the loss for which Nichols seeks indemnification did not arise out of STAT's performance of its "duties" under the Credentialing Agreement.

A duty is "[a] legal obligation that is owed or due to another and that needs to be satisfied." *Manistee Cty. Intermediate Sch. Bd. v. MASB-SEG Prop. Cas. Pool, Inc.,* 2005 WL 1048747, at *3 (Mich. Ct. App. May 5, 2005) (quoting Black's Law Dictionary (7th ed)). And a contractual "duty" is a legal "obligation to do a certain thing." *Id.*

Here, Nichols seeks indemnification for a loss that allegedly arose from STAT's negligent delivery of radiology services. However, STAT had no legal obligation *under the Credentialing Agreement* to provide those services to Trinity. On the contrary, it was the subcontract between STAT and X-Ray – *not* the Credentialing Agreement – that called for STAT to provide radiology services in

11

connection with radiological images taken at Trinity. Indeed, the initial clauses of the Credentialing Agreement (quoted above) make clear that STAT's obligation "to provide radiology services" for Trinity patients arises under the "existing … subcontract[]" between STAT and X-Ray. (ECF No. 31-6, PageID.382.) Moreover, there is not a single provision in the Credentialing Agreement that obligated STAT to provide radiology services to Trinity. The Credentialing Agreement, in essence, simply required STAT to use properly credentialed physicians when carrying out its duties *under its subcontract* with X-Ray to provide radiology services at Trinity. Because STAT had no duty under the Credentialing Agreement to provide radiology services, Nichols is not entitled to indemnification under the Credentialing Agreement Indemnification Provision for losses that allegedly arose out of STAT's negligent delivery of such services.

Nichols responds that certain provisions of the Credentialing Agreement do place a legal obligation on STAT to provide radiology services to Trinity. For example, Nichols says that paragraph four of the Credentialing Agreement provides that STAT "shall provide [Trinity] with a listing of all [STAT] radiologists who may provide [radiology services under the agreement between X-Ray and STAT] *to* Trinity, including the scope of privileges that [STAT] has granted to each radiologist." (*Id.*, PageID.383; emphasis added.) Nichols insists that because this provision references services that will be provided *to* Trinity, and not simply *at*

12

Trinity, it imposes a legal obligation on STAT to perform those services. But Nichols' argument does not account for paragraph four as a whole. That paragraph says that STAT "shall provide [Trinity] with a listing of all [STAT] radiologists who *may* provide" radiology services to Trinity (*id;* emphasis added); nowhere does that paragraph *require* STAT to provide any services. While the Credentialing Agreement is not drafted as clearly as it could have been, it is not reasonable to read the agreement, as a whole, as placing any legal duty on STAT to provide radiology services to Trinity.

For all of these reasons, the loss for which Nichols seeks indemnification was not a "result of the performance of [STAT's] duties" under the terms of the Credentialing Agreement. Thus, Nichols is not entitled to indemnification under the Credentialing Agreement Indemnification Provision. STAT is therefore entitled to summary judgment.

## IV

Accordingly, **IT IS HEREBY ORDERED** that STAT's motion for summary judgment (ECF No. 32) is **GRANTED** and Nichols' motion for summary judgment (ECF No 31) is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated: May 7, 2021 UNITED STATES DISTRICT JUDGE

      I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 7, 2021, by electronic means and/or ordinary mail.

                                                    <u>s/Holly A. Monda</u>
                                                    Case Manager
                                                    (810) 341-9764